**In re LTV STEEL COMPANY, INC., et al., Debtors.**

**Michael H. Holland, et al., Plaintiffs,**

**v.**

**LTV Steel Company, Inc., et al., Defendants.**

**Bankruptcy No. 00–43866.
Adversary No. 02–4078.**

United States Bankruptcy Court, N.D. Ohio.

Dec. 23, 2002.

John R. Mooney, Marilyn L. Baker, Elizabeth A. Saindon, Mooney, Green, Baker & Saindon, P.C., Washington, DC, Joyce Goldstein, Goldstein & O'Connor, Cleveland, OH, for Plaintiff.

Heather Lennox, Jones, Day, Reavis & Pogue, Cleveland, OH, Richard F. Shaw, Jones, Day, Reavis & Pogue, Pittsburgh, PA, for Defendant.

David M. Fusco, Cleveland, OH, for United Mine Workers of America.

Philip J. Uher, Pittsburgh, PA, for JP Morgan Chase Bank.

Saul Eisen, Cleveland, OH, United States Trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Chief Judge.

Plaintiff Michael H. Holland and others, as Trustees of the United Mine Workers of America 1992 Benefit Plan ("Plaintiff"), filed a complaint on May 1, 2002 asking for declaratory and injunctive relief that would require Debtor–in–Possession/Defendant LTV Steel Company, Inc. and others ("Defendant") to comply with 26 U.S.C. § 9711, the Coal Industry Retiree Health Benefit Act of 1992 ("the Coal Act").

A detailed explanation of the procedural history of this adversary proceeding, which follows, is necessary to explain this Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

## PROCEDURAL HISTORY

On May 2, 2002, Plaintiff filed a motion to withdraw the reference, pursuant to 28 U.S.C. § 157(d).[1] On May 15, 2002, this Court received an acknowledgment from the United States District Court for the Northern District of Ohio in Youngstown ("District Court") regarding the motion to withdraw the reference. On May 29, 2002, the District Court denied the motion to withdraw the reference. A copy of the District Court's memorandum opinion and order ("District Court Order") is attached hereto as Exhibit A and is incorporated by reference as if fully rewritten herein.∎

---

1. All references to United States Code provisions refer to the 2002 version.

On May 31, 2002, in this Court, Plaintiff filed a notice of pending motion of preliminary injunction. A motion for a preliminary injunction was filed with the District Court on May 24, 2002 but was not filed with this Court until June 18, 2002. On June 3, 2002, Plaintiff filed an emergency motion for expedited consideration of the motion for a preliminary injunction. This motion was granted, and a hearing was held on June 4, 2002. Marilyn L. Baker, Esq., John R. Mooney, Esq., Elizabeth A. Saindon, Esq. and Joyce Goldstein, Esq. appeared on behalf of Plaintiff. Heather Lennox, Esq. and Richard F. Shaw, Esq. appeared on behalf of Defendant. David M. Fusco, Esq. appeared on behalf of the United Mine Workers of America. Philip J. Uher, Esq. appeared on behalf of JP Morgan Chase Bank.

At the June 4, 2002 hearing, a briefing schedule was set and this Court issued an order consolidating the motion for a preliminary injunction with a trial on the merits pursuant to FED. R. BANKR. P. 7065 ("consolidated hearing"). Each party filed briefs with the Court on the issues of whether the Coal Act applies to Defendant and whether an injunction is appropriate. The consolidated hearing was held on June 19, 2002. Marilyn L. Baker, Esq., Elizabeth A. Saindon, Esq. and Joyce Goldstein, Esq. appeared on behalf of Plaintiff. John R. Woodrum, Esq., Jeffrey B. Ellman, Esq. and Richard F. Shaw, Esq. appeared on behalf of Defendant.

On June 19, 2002, pursuant to an oral motion to modify the automatic stay to permit the suit against Defendant, an order sustaining the motion was entered to the extent necessary to permit the proceeding to go forward. Stipulations of fact

were filed, and this Court issued a partial ruling from the Bench, concluding that the Coal Act applies to Defendant.[2] This Court reserved judgment on the issue of enforcement pending post-trial briefing by the parties. Both parties filed post-trial briefs. On July 12, 2002, Plaintiff filed a motion to strike or, in the alternative, to submit a reply to matters in Defendant's brief that are outside the scope of the enforcement of the Coal Act. On October 1, 2002, this Court sustained Plaintiff's motion to submit a reply, and Plaintiff filed a reply on October 11, 2002.

While pleadings were filed and the consolidated hearing was held, Defendant had not yet filed a responsive pleading. On August 15, 2002, this Court issued an order directing that service be effected within twenty (20) days. Plaintiff filed a certificate of service with this Court on August 23, 2002, evidencing that service of the summons and a copy of the complaint were served on Defendant. Defendant filed an answer with this Court on September 17, 2002.

## PRELIMINARY MATTERS

### I. JURISDICTION

The District Court Order denied the motion to withdraw the reference, holding that "the Bankruptcy Court provides the most efficient and effective forum for resolving this dispute." (District Court Order—Exhibit A at 7–8.) Despite this Court's reluctance to exercise jurisdiction where a plain reading of 28 U.S.C. § 157(d) leads to the conclusion that jurisdiction in this case has not been conferred to this Court by Congress, nevertheless, this Court feels compelled to decide this case because of the prior District Court

---

**2.** Although findings, conclusions and a ruling were issued from the Bench, this opinion amplifies them and is intended to constitute the

findings and conclusions underlying the formal order being entered simultaneously.

Order denying the motion to withdraw the reference.[3]

## II. DEFENDANT'S ANSWER

The complaint in this case was filed on May 1, 2002. Defendant did not file an answer in this matter until September 17, 2002. This Court's records did not include a certificate of service or other evidence of service of summons and a copy of the complaint on Defendant. There was no evidence of waiver of service by Defendant in the Court's records.

Pursuant to FED. R. CIV. P. 4(m), incorporated herein by FED. R. BANKR. P. 7004(a), this Court directed that service be effected within twenty (20) days. Plaintiff filed a certificate of service with this Court on August 23, 2002. Defendant filed an answer with this Court on September 17, 2002. Having received an answer, the record is now complete.

## III. PLAINTIFF'S NOTICE OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff filed a notice of motion for preliminary injunction with this Court after filing a motion for preliminary injunction with the District Court. The motion was not filed with this Court until the day before the consolidated hearing.

Federal Rule of Bankruptcy Procedure (FED. R. BANKR. P.) 9005 adopts Federal Rule of Civil Procedure (FED. R. CIV. P.) 61 regarding harmless error. It states, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

In this case, Plaintiff filed an emergency motion for expedited consideration on June 3, 2002 on a matter that was not properly before this Court. This motion was granted, and a hearing was held on June 4, 2002. Defendant had notice of the motion for preliminary injunction as they were properly served a copy of it along with the notice of the pending motion for preliminary injunction before the hearing on June 4, 2002.

This Court, pursuant to FED. R. BANKR. P. 9005, did disregard the procedural error as it did not affect the substantial rights of the parties. Defendant had notice of the appropriate motion. Moreover, Plaintiff corrected the error by properly filing a motion for a preliminary injunction before a hearing on the merits was held.

## IV. DEFENDANT'S AFFIRMATIVE DEFENSES

Defendant pleads the following affirmative defenses: failure to state a claim upon which relief may be granted; the complaint is barred by equitable doctrines including waiver, laches, estoppel and unclean hands; Plaintiff did not satisfy mandatory equitable requirements for obtaining injunctive relief; none of the Defendants who are "related persons" to Defendant remain "in business" within the definition of 26 U.S.C. § 9701(c)(7) and this Court lacks jurisdiction to require Defendant to establish an individual employer plan under the provisions of either the Coal Act or the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* For the reasons that follow, all of Defendant's affirmative defenses are overruled.

### ISSUES

There are two issues pending before this Court. The first issue is whether the Coal

---

**3.** This adversary proceeding is based on a sole cause of action found only in non-bankruptcy law, namely 26 U.S.C. § 9711, the Coal Act.

Act applies to Defendant. The second issue is whether an injunction is appropriate.

## I. THE COAL ACT APPLIES TO DEFENDANT

The history of the health care crisis in the coal industry and the events leading to the enactment of the Coal Act have been recounted in detail by various courts, including the Supreme Court and the United States Court of Appeals for the Sixth Circuit. *See, e.g., Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 445–48, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); *E. Enters. v. Apfel*, 524 U.S. 498, 504–11, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (plurality opinion); *Blue Diamond Coal Co. v. Sec'y of Health and Human Servs. (In re Blue Diamond Coal Co.)*, 79 F.3d 516, 518–21 (6th Cir. 1996); *Barrick Gold Exploration, Inc. v. Hudson*, 47 F.3d 832, 833–34 (6th Cir. 1995); *LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 481–85 (2d Cir.1995); *See also, Coal Comm'n Report: A Report to the Sec'y of Labor and the Am. People*, November 1990 (analyzing the health care crisis in the coal industry and recommending solutions).[4] A brief history is helpful to understand the nature of the instant case.

Beginning in 1946, coal miners received pension and health benefits pursuant to a series of employer-funded plans negotiated by the United Mine Workers of America ("UMWA") and the Bituminous Coal Operators Association ("BCOA"). From 1974 through 1978, non-pension benefits were provided under two plans, the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. In 1978, the UMWA and BCOA partially decentralized the scheme in the National Bituminous Coal Wage Act ("NBCWA") by agreeing that each miner retiring after January 1, 1976 would receive health benefits pursuant to a plan created and funded by the miner's last employer ("individual employer plan" or "IEP") and that the 1974 UMWA Benefit Plan would provide health benefits to orphaned retirees and their families. These so-called "orphans" are those retirees whose last employer has gone out of business and/or is no longer providing health benefits. *See E. Enters.*, 524 U.S. at 504–10, 118 S.Ct. 2131.

In the 1980s, the 1950 and 1974 UMWA Benefit Plans suffered serious financial difficulties. Numerous coal companies that signed the 1978 NBCWA attempted to avoid responsibility for contributing to health coverage for UMWA retirees. These companies sought to terminate their participation in the 1950 and 1974 UMWA Benefit Plans and to "dump" the retirees from their individual employer plans into the 1974 UMWA Benefit Plan. These companies also failed to pay into the 1950 and 1974 UMWA Benefit Plans and essentially dumped their contribution obligations on the remaining employers that continued to pay into the UMWA Benefit Plans. As a result, the funding bases eroded for the two UMWA Benefit Plans, the 1974 UMWA Benefit Plan incurred additional liabilities and the remaining signatories of the NBCWAs were required to pay higher contributions to finance coverage for retirees who had been abandoned by their former employers. *See Id.* at 510–11, 118 S.Ct. 2131.

An industry-wide commission was created and charged with the task of analyzing the retiree health care crisis and recommending solutions. *See Id.* at 511–12, 118

---

4. A copy of the Coal Commission Report is attached as an exhibit to Plaintiff's motion for preliminary injunction.

S.Ct. 2131; *See also* Coal Comm'n Report at 1. The November 5, 1990 Coal Commission report explained that the collective bargaining process was inadequate to provide a long-term solution and that legislation would be necessary to solve the crisis. The Coal Commission concluded that retired miners had legitimate expectations of receiving lifetime health benefits and that a statutory funding obligation should be imposed on current and former signatories to NBCWAs. Coal Comm'n Report at 1, 60. The Commission also concluded that the legislation should include mechanisms to prevent future dumping of retiree health obligations. Coal Comm'n Report at 60.

Congress responded by enacting the Coal Act. The Coal Act establishes a system whereby each coal operator that was or had been a signatory operator to a coal wage agreement would pay for the benefits provided to its own retirees and would share in the cost of providing benefits to orphaned retirees. The Coal Act contains three mechanisms for this purpose. First, it requires continuation of individual employer plans created pursuant to the 1978 NBCWA. *See* 26 U.S.C. § 9711(a). The second and third mechanisms are the Combined Fund and the 1992 Benefit Plan which are primarily financed through per beneficiary premiums payable by coal operators based on the number of individual beneficiaries attributed to them through assignment by the Secretary of Health and Human Services. *See* 26 U.S.C. §§ 9702(a), 9704, 9706, 9712.

The Combined Fund is not at issue in this case. It covers beneficiaries eligible for and receiving benefits from the UMWA 1974 Benefit Plan and the 1950 Benefit Plan as of July 20, 1992. *See* 26 U.S.C. § 9703(f). The 1992 Benefit Plan is essentially the new orphan plan required to provide health benefits to individuals not receiving benefits from either the Combined Fund or their employers' individual employer plans. *See* 26 U.S.C. § 9712(b)(2).

Plaintiff in this case, as Trustees of the United Mine Workers of America 1992 Benefit Plan, filed an adversary proceeding seeking to preclude Defendant from terminating retiree health care obligations under § 9711 of the Coal Act.

Section 9711 of the Coal Act is titled "[c]ontinued obligations of individual employer plans." Section 9711(a) states:

> The last signatory operator of any individual who, as of February 1, 1993, is receiving retiree health benefits from an individual employer plan maintained pursuant to a 1978 or subsequent coal wage agreement shall continue to provide health benefits coverage to such individual and the individual's eligible beneficiaries which is substantially the same as (and subject to all the limitations of) the coverage provided by such plan as of January 1, 1992. Such coverage shall continue to be provided for as long as the last signatory operator (and any related person) remains in business.

Signatory operator is defined as "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. § 9701(c)(1). A related person may be a member of a controlled group of corporations, a business which is under common control, any other person who is identified as having a partnership interest or joint venture with a signatory operator and a successor in interest of any of these entities. *See* 26 U.S.C. § 9701(c)(2). Section 9701(c)(7) states that "[f]or purposes of this chapter, a person shall be considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry."

Stipulations of fact were filed by the parties in this case on June 19, 2002.

Among other facts, Defendant admitted that it is a last signatory operator, as defined above. (*See* Stipulations of Fact, ¶ 4.) Defendant also admitted that prior to terminating its individual employer plan, it was providing health benefits to approximately 540 beneficiaries. (*See* Stipulations of Fact, ¶ 26.)

At the hearing, this Court decided that "the Coal Act applies to LTV." (June 19, 2002 Transcript at 56.) This Court also decided that Defendant is "in business within the extremely broad statutory definition included in the Coal Act." (*Id.* at 57.) As the Third Circuit Court of Appeals stated,

> [t]he statutory definition of "in business" is broad, including within its scope not only (1) an entity that "conducts" business activity, but also (2) one who "derives revenue" from business activity. Because the "conducts" prong is provided for separately, the "derives revenue" prong does not require the party liable under the Coal Act to itself "conduct" a business activity. Otherwise, the "derives revenue" option would be surplusage, which cannot have been Congress's intent. By the statute's own terms, then, someone other than the "signatory operator" may be the one engaging in the business activity.

*Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688, 692 (3rd Cir.1996) (internal citations omitted). This Court finds this interpretation persuasive and so adopts it. Whether or not there is a profit is not a relevant determination when deciding whether or not a company is "in business" for purposes of the Coal Act. Because the applicable statutory language is so broad, Defendant is itself still in business. As evidence, Defendant is presently allocating the funds derived from the sale of its integrated steel business. This is conducting business, pursuant to the Coal Act's definition. Defendant meets the Coal Act's statutory elements, and so the Coal Act applies to Defendant.

## II. INJUNCTIVE RELIEF

### A. Injunctive Relief Under § 9711

Injunctive relief is available under § 9711. Absent injunctive relief, courts would have no enforcement mechanism to apply to this section. The goal of § 9711 of the Coal Act is to prevent the dumping of eligible beneficiaries. "[T]he principal problem with prior plans that the Coal Act was designed to remedy had been caused by coal operators ceasing business and 'dumping' those employees for whom they were obligated to provide benefits." *Holland v. Double G Coal Co., Inc.*, 898 F.Supp. 351, 355 (S.D.W.Va.1995).

Section 9711 requires that employers and former employers in the coal industry be directly responsible for the health care of their own retirees.

> In the 1980s, many coal companies went out of business or otherwise ceased contributing to the funds, effectively dumping their retirees into the beneficiary populations and forcing the remaining, participating employers to shoulder increasingly large contribution obligations to pay not only for their own retirees but also for these newly "orphaned retirees."

*Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.)*, 174 B.R. 722, 724 (E.D.Tenn.1994), *aff'd, Blue Diamond Coal Co.*, 79 F.3d at 516. An injunction is the most effective means by which to enforce § 9711.

The Supreme Court has stated, "where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)

(*quoting Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917)). Without injunctive relief, there would be no enforcement mechanism to apply to § 9711 of the Coal Act. Under the Coal Act, "[t]he potential for abusive dumping of retirees, so they would be supported by other operators, inherent in the multi-employer Plans, ... [was] excised." *Carbon Fuel Co. v. USX Corp.*, 891 F.Supp. 1186, 1197–98 (S.D.W.Va.1995). Moreover, "the Coal Act must be viewed as a rational legislative response to a crisis in coal retiree health benefits." *Blue Diamond Coal Co.*, 174 B.R. at 729.

On the basis of the plain language of the statute and the attendant legislative history, this Court holds that § 9711 is unambiguous evidence of Congress' express intent to permit federal courts to issue injunctions. This Court concludes it has authority under § 9711 and the District Court Order to issue an injunction.

### B. Permanent Injunction

■■■■ Courts in this Circuit examine the following factors when determining the propriety of a permanent injunction:[5] whether the plaintiff has prevailed on the merits of its claim, whether the plaintiff will suffer irreparable injury if the permanent injunction is not issued and whether the balance of equities weighs in favor of the entry of the permanent injunction. *Earley v. Executive Bd. of United Transp. Union*, 957 F.Supp. 997, 999–1000 (N.D.Ohio 1996). Plaintiff in this case has prevailed on the merits of its claim.

#### 1. Irreparable Injury

The Supreme Court has stated that "the basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Samp-son v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (*quoting Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). The concept of "irreparable injury" has been described as follows:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson*, 415 U.S. at 90, 94 S.Ct. 937 (*quoting Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 104 U.S.App.D.C. 106 (C.A.D.C.1958)).

Defendant argues that Plaintiff will not suffer loss or harm as a result of the termination of Defendant's IEP and that no beneficiaries will suffer any loss or reduction in benefits. There is a provision in the Coal Act that provides for the transfer of beneficiaries to Plaintiff. *See* 26 U.S.C. § 9711(c)(1). This section, Defendant argues, is the mechanism that Congress established to guarantee benefits, which is why there is no harm to beneficiaries. This argument, however, is not persuasive.

While the beneficiaries may be receiving health and life insurance benefits, Plaintiff will be irreparably injured if the permanent injunction is not issued. Plaintiff is obligated to provide coverage to eligible beneficiaries once Defendant ceases providing health benefits pursuant to its IEP. Plaintiff must provide coverage to hundreds of new eligible beneficiaries without any corresponding contribution from De-

---

5. This Court combined the preliminary injunction with a trial on the merits, therefore the standard is that for a permanent injunction.

fendant. As aforementioned, it is this "dumping" of retiree health obligations that Congress attempted to alleviate upon passing the Coal Act. The Court finds persuasive Plaintiff's explanation of the repercussions of dumping.

> As more retirees are eligible for coverage from the [1992] Plan without corresponding contributions, the remaining contributing employers must increase their contributions to the [1992] Plan in order to ensure the continued provision of the promised retiree health benefits. As the contribution burden increases, more and more employers will face further financial hardships which in turn creates more "orphan" retirees. Such a downward spiral will have profound effects on the structure that Congress created in the Coal Act.

(Plaintiff's Memorandum in Support of Motion for Preliminary Injunction attached to Plaintiff's Motion for a Preliminary Injunction at 14.)

The Sixth Circuit Court of Appeals has held that failure to make required contributions to a multi-employer plan constitutes irreparable injury. *See Laborers Fringe Benefit Funds v. Northwest Concrete & Constr., Inc.,* 640 F.2d 1350, 1353 (6th Cir.1981). In that case, an employee benefit plan brought suit to recover contributions owed and to enjoin the defendant employer from failing to make contributions in the future. The Circuit Court held that the employer's "continued violations of the [collective bargaining] agreements and ERISA will irreparably injure the Fund." *Id.* Another court granted a motion for summary judgment which sought injunctive relief prohibiting defendant employer from failing to provide health care benefits to eligible retirees and their dependents on the grounds that a joint venture is a related person under the Coal Act, and is therefore liable. *See Hol-*

*land v. High Power Energy,* 98 F.Supp.2d 741, 741 (S.D.W.Va.2000).

Money damages are not sufficient to remedy the injury in this case. Defendant argues that if Plaintiff can establish the amount and classification of its claims under the Coal Act, such claims will be satisfied in accordance with the priority scheme of the Bankruptcy Code. This argument, however, assumes that Defendant is no longer in business. We have already held that Defendant is in business and that § 9711 applies to Defendant. Thus, Defendant is obligated by § 9711 to provide health benefits to eligible beneficiaries.

Defendant also argues that they did not have the financing to fund a health benefits plan. This Court asked for post-trial briefs on that issue. After a thorough review of the record as a whole, including the transcript of the June 19, 2002 consolidated hearing, the post-trial briefs, relevant financing documents and applicable law, this Court concludes that this argument is not a defense to liability. Defendant remains liable under § 9711. Defendant's lack of financing argument is an impossibility defense to compliance with § 9711. Impossibility is a defense in contract law. *See United States v. General Douglas MacArthur Senior Village, Inc.,* 508 F.2d 377, 381 (2nd Cir.1974) (stating, "[i]n general, impossibility may be equated with an inability to perform as promised due to intervening events, such as an act of state or destruction of the subject matter of the contract"). This is not a contract dispute but rather is a statutorily mandated obligation. Impossibility is also a defense to civil contempt charges. *See Hunter v. Magack (In re Magack),* 247 B.R. 406, 410 (Bankr.N.D.Ohio 1999) (stating, "impossibility or an inability to comply with a judicial order is a valid defense to a charge of civil contempt"). This is likewise not a civil contempt proceeding but

rather is a statutory obligation. Defendant's lack of financing argument is not applicable.

Defendant's argument that money damages in the form of a bankruptcy claim is appropriate, and Defendant's impossibility arguments against compliance with § 9711 do not outweigh that Plaintiff will suffer irreparable injury if a permanent injunction is not issued.

### 2. Balance of Equities

This Court must determine whether substantial injury to others will result from injunctive relief. *See Martin–Marietta Corp. v. Bendix Corp.,* 690 F.2d 558, 568 (6th Cir.1982). The Court there held that "[t]he irreparable injury appellants will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by appellees as a result of the granting of injunctive relief." *Id.* The balance of equities in this case weighs in favor of issuing the injunction.

Historically, a bankruptcy court is a court of equity. *Local Loan Co. v. Hunt,* 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity"); *Pepper v. Litton,* 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Sec. & Exch. Comm'n v. United States Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *Bank of Marin v. England,* 385 U.S. 99, 103, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966).

As Senator John Glenn stated in support of passage of the Coal Act:

> The goal of this package is fundamental: to ensure health care coverage to tens of thousands of retired coal miners and their families—not just because it's a good idea, but because it's a promise that we must keep—a promise to workers who lived up to their commitment to supply our nation's energy needs.
>
> .　　.　　.　　.　　.
>
> The difficult part is determining how to pay for it. The legislation before us today has changed significantly in this respect over the past year. The key difference is in how the bill will pay for so-called "orphan miners," meaning those whose companies are out of business. Originally, the legislation included a broad industrywide fee in order to keep up with the ongoing health costs of these retirees. But this has been changed at the urging of the administration so that premium payments will be made only by those for whom the retirees worked.
>
> .　　.　　.　　.　　.
>
> *This applies to companies that may no longer be in mining, such as LTV.*

138 Cong. Rec. S18250 (daily ed. Oct. 8, 1992) (statement of Sen. Glenn) (emphasis added).

The public interest weighs strongly in favor of granting the injunction. Congress specifically declared that it is the policy of the Coal Act "to remedy problems with the provision and funding of health care benefits with respect to the beneficiaries of multi-employer benefit plans that provide health care benefits to retirees in the coal industry" and "to provide for the continuation of a privately financed self-sufficient program for the delivery of health care benefits to the beneficiaries of such plans." 26 U.S.C. § 9701, Historical and Statutory Notes. Congress addressed the importance of retiree health benefits in the coal industry and concluded that it is in the public interest to insist that former employers bear the costs of providing benefits to their beneficiaries.

Moreover, issuing an injunction only imposes upon Defendant the burden that

Congress determined is appropriate. To refrain from issuing the injunction would allow Defendant to dump their beneficiaries. This would be contrary to the clearly stated intent of the Coal Act. Congress included § 9711 in the Coal Act specifically to eliminate the ability of employers to dump their retirees.

Defendant argues that Plaintiff has a claim pursuant to § 9712[6] of the Coal Act, and Plaintiff will stand in line with other creditors to receive whatever payments will be available. Defendant argues that by issuing an injunction, the Court will violate the priorities scheme established by Congress in the Bankruptcy Code; providing health care benefits would grant a superpriority where none exists.

Defendant's argument is not persuasive because money damages are not appropriate in this case. The payment of premiums under § 9712 does not alleviate the problem of dumping because § 9711 requires covered employers to maintain their own retiree health benefit plans to provide benefits directly to their retirees. In this respect, the Fourth Circuit Court of Appeals has held that, "[t]he Bankruptcy Code ... does not trump the clear intent of the Coal Act but simply effectuates treatment of any claims that may arise from its operation." *UMWA 1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.),* 146 F.3d 1273, 1279 (10th Cir.1998) (determining that "the two statutory schemes may be harmoniously construed"). Congress intended for § 9711 to alleviate the problem of dumping beneficiaries. An injunction is the only means by which to enforce § 9711. The relief sought by Plaintiff is required by statute. The equi-

ties weigh in favor of granting the injunction.

## CONCLUSION

The Coal Act applies to Defendant, as Defendant meets the statutory elements. Pursuant to 26 U.S.C. § 9711 and the District Court Order, an injunction is the appropriate remedy in this case.

An appropriate order shall enter.

## ORDER

For the reasons set forth in the Court's memorandum opinion entered herein of even date, judgment is granted to Plaintiff on its complaint. Defendant's affirmative defenses are overruled.

Defendant is hereby enjoined from taking any action which denies the provision of benefits mandated by 26 U.S.C. § 9711. Defendant shall provide health benefits coverage to such individuals and the individuals' eligible beneficiaries which is substantially the same as (and subject to all the limitations of) the coverage provided as of January 1, 1992 and shall continue to provide such coverage so long as the last signatory operator (as defined in 26 U.S.C. § 9701(c)(1)) and any related person remains in business.

This order shall be binding upon Defendant to this action, its officers, agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order, and shall be effective immediately upon docketing by the Clerk. The Court finds that no sum of security is

---

**6.** Section 9712 is the provision of the Coal Act that requires the 1992 Benefit Plan to provide benefits to any person who but for enactment of the Coal Act would be eligible to receive benefits from the 1950 or 1974 Benefit Plans, based upon age and service, or with respect to whom coverage is required to be provided under § 9711 directly by an individual employer, but who does not receive such coverage. See 26 U.S.C. § 9712(b)(2)(A) and (B).

proper and thus none is required of Plaintiff as applicant.

**IT IS SO ORDERED.**